**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LAURA R. CARR,

  Plaintiff,

v.                    Case No. 13-12001
                    Hon. Lawrence P. Zatkoff

CITY OF SAGINAW,

  Defendant.
_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on December 2, 2014

PRESENT:  THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment [Dkt. 18]. Plaintiff filed a response.[1]  Despite having ample time to do so, Defendant has not filed a reply to Plaintiff's response.  The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument.  Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted, without oral argument.  For the following reasons, Defendant's motion is GRANTED.

---

[1] Due to technological difficulties, Plaintiff's response to Defendant's motion was filed one day after the filing deadline.  Plaintiff's response was accompanied by a Motion for Extension of Time to File Response/Reply [Dkt. 20].  In finding that Plaintiff has shown good cause and that Defendant will not be unfairly prejudiced, the Court grants Plaintiff's Motion for Extension of Time to File Response/Reply [Dkt. 20].

## II. BACKGROUND

On December 23, 2009, Laura Carr ("Plaintiff"), an African American police officer, filed a charge of race and gender discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against her employer, the City of Saginaw ("Defendant"). Despite having been in Defendant's employ for approximately ten years at the time, Plaintiff was passed over for a promotion. Instead, Defendant hired a Caucasian male officer with less experience than Defendant. The male officer did, however, score substantially higher in his interview evaluation than did Plaintiff. As a result, Plaintiff filed the aforementioned EEOC complaint, and subsequently filed suit against Defendant on November 19, 2010, in the United States District Court for the Eastern District of Michigan. *See Laura Carr-Nelson v. City of Saginaw*, Case No. 10-14624. On January 18, 2012, Defendant was granted summary judgment and Plaintiff's claims were dismissed with prejudice. *See Nelson v City of Saginaw*, 2012 WL 137582 (E.D. Mich. Jan. 18, 2012) (Ludington, J.).

Plaintiff remained in Defendant's employ even after commencing the aforementioned litigation. In approximately January 2010, Plaintiff sustained an injury that required substantial time away from the job. Pursuant to Defendant's established practice, Plaintiff took an unpaid leave of absence for the duration of one year beginning in January 2010.[2] As her one year deadline approached, Plaintiff requested an extension of eleven days in an effort to obtain a release from her doctor to return to work without medical restriction. Defendant granted Plaintiff the extension as requested, *see* Dkt. # 18, Ex. 3, and Plaintiff obtained a release from her doctor to work without medical restriction.

---

[2] It is Defendant's established practice to leave an employee's position open for one year during a medical leave of absence. If an employee is unable to return to work after one year, his or her employment is terminated at that time. *See* Dkt. # 18, Ex. 8, p. 10.

Plaintiff returned to work as a police officer with the Saginaw Police Department in February 2011.  On June 13, 2011, Plaintiff requested a transfer to the patrol officer desk position at police headquarters due to shoulder pain stemming from what she claims is a previous work-related injury.  Specifically, Plaintiff experienced pain when her protective vest, which must be worn by a police officer at all times, pressed against her shoulder.  *See* Dkt. # 18, Ex. 5.

As the result of a June 15, 2011, medical evaluation, it was determined that Plaintiff was unable to perform the duties of a police officer.  The same day, Defendant *temporarily* granted Plaintiff's transfer request.  Then-Police Chief Gerald Cliff's letter tentatively granting Plaintiff's request provided, in part:

> Per our conversation today with you, me and Employee Services, we agreed to place you on a **temporary** assignment at the front desk of the [Saginaw Police Department] until a determination is made whether the alleged injury is work related or not.
>
> In the event it is determined by the workers [sic] compensation administrator/carrier that the alleged injury is not work related, this temporary assignment will no longer be available to you.
>
> As indicated in the email I sent on June 15, 2011, beginning June 16th at 7:00 a.m., you are "TEMPORARILY" assigned to the front desk . . . . [t]his assignment is only temporary pending a final determination by the workers [sic] compensation administrator.

Dkt. # 18, Ex. 6.  Emphasis in original.

Plaintiff worked at the desk position for one day—June 16, 2011.  That same day, Defendant's third-party Workers' Compensation Administrator ("Administrator") filed a notice of dispute pertaining to Plaintiff's Workers' Compensation claim on the grounds that "[t]he injury is not work related."  Defendant notified Plaintiff on June 17, 2011, that due to the Administrator's findings that the injury was not work-related, the temporary assignment was no

longer available to her. *See* Dkt. # 18, Ex. 7. Plaintiff returned to her regular patrol duties as a result of the revocation of the temporary desk assignment.[3]

On July 26, 2011, Plaintiff claims that she "blew her knee out" while walking through a yard during a shift as a police officer. She left work and did not return. Thus, Plaintiff's second medical leave commenced July 26, 2011. Plaintiff filed a Workers' Compensation claim soon thereafter. On August 10, 2011, Plaintiff was notified that: (a) her Workers' Compensation claim was being disputed on the grounds that the injury was not work-related, and (b) further investigation was required because "[Plaintiff] has failed to cooperate with the investigation." *See* Dkt. # 19, Ex. 8. Plaintiff's Workers' Compensation claim was ultimately denied.

On September 15, 2011, Plaintiff attended an independent medical examination with Dr. Zachary Endress. Dr. Endress opined that Plaintiff exhibited "symptoms of degenerative osteoarthritis in her right knee," which he believed "was aggravated by the twisting injury which occurred on July 26, 2011." *See* Dkt. # 19, Ex. 12, p. 1. Dr. Endress concluded that Plaintiff was "disabled from the work duties required of a Police Officer unless there was [sic] a sedentary type of work available." *Id.*

On November 28, 2011, Plaintiff applied for a duty disability pension with the City of Saginaw Police and Fire Pension Board (the "Board") based on the allegedly work-related knee injury. *See* Dkt. # 18, Ex. 18, ¶ 19. On January 27, 2012, the Board requested that Plaintiff attend an examination by Dr. Tim E. Eckstein, the Medical Director of Covenant Occupational Health, in relation to Plaintiff's duty disability pension application. *See* Dkt. # 18, Ex. 18, ¶ 21.

---

[3] While the Court acknowledges that Plaintiff returning to work as a police officer on June 17, 2011, seemingly contradicts the June 15, 2011, determination that Plaintiff was unable to perform the duties of a police officer, the parties nonetheless claim that Plaintiff was medically cleared to return to work on June 17, 2011.

4

As a result of that examination, Dr. Eckstein concluded that to the extent Plaintiff suffers from a physical malady, such ailment has potentially been magnified by a mental disorder:

> This evaluation fails to reveal objective evidence of pathology consistent with the degree of disability subjectively reported. The pain intensity appears to exceed that which can be accounted for by virtue of the available diagnostic studies or for what was discerned during the limited physical examination. Preoccupation with pain, pain catastrophizing, and fear of movement behaviors are strongly suggested and may potentially be related to an underlying factitious disorder as well as possibly a mood disorder . . . . No findings consistent with a major physical disability precluding fulfilling the role of a police officer are identified at this time. Given this impression, [Plaintiff] may benefit from a thorough neuropsychological evaluation.

Dkt. # 19, Ex. 15, p. 5. Relying on Dr. Eckstein's report, the Board denied Plaintiff's application for a duty disability pension on March 20, 2012. *See* Dkt. # 18, Ex. 18, ¶ 23. Plaintiff promptly appealed the Board's decision, however, the outcome of that appeal is unknown to the Court. *See* Dkt. # 18, Ex. 18, ¶ 25.

In the interim, Plaintiff's one year deadline to return to work from the July 26, 2011, injury to avoid termination under Defendant's established medical leave policy grew near. On August 29, 2011, Defendant notified Plaintiff that her previous absences had exhausted her medical leave time under the Family Medical Leave Act, and that she had no remaining protection under the Act as a result. *See* Dkt. # 18, Ex. 9. Defendant sent similar correspondence on April 5, 2012, May 4, 2012, and July 2, 2012, continually notifying Plaintiff that she must return work before July 26, 2012, in order to maintain her position as a police officer. *See* Dkt. # 18, Ex.'s 10-12. Plaintiff did not respond in writing to Defendant's notices. On July 10, 2012, Plaintiff claims that she told Dennis Jordan, Defendant's Director of Employee Services, that she could "come in and work desk," an offer which Mr. Jordan allegedly denied. *See* Dkt. # 19, Ex. 2, p. 8.

Plaintiff did not return to work prior to the July 26, 2012, deadline, nor did she submit a written request for a time extension for the purpose of obtaining medical clearance to return to work. Indeed, she has never presented Defendant with documentation indicating that she is medically cleared to return to work as a police officer.[4] Plaintiff was terminated on July 26, 2012, as a result of her one year absence from work. *See* Dkt. # 19, Ex. 20.

On August 1, 2012, Plaintiff filed another charge of discrimination with the EEOC against Defendant, this time alleging that Defendant: (a) refused to accommodate Plaintiff's disability, and (b) terminated Plaintiff as a result of the initial federal lawsuit commenced against Defendant. Plaintiff obtained a "right to sue letter" from the EEOC on February 11, 2013, and commenced the instant litigation against Defendant on May 6, 2013. On August 9, 2013, Plaintiff filed suit against the Board in Saginaw County Circuit Court in connection with the Board's denial of her application for a duty disability pension. *See* Dkt. # 18, Ex. 18. The outcome of that litigation is unknown to the Court.

In her three-count complaint in this cause of action, Plaintiff alleged Retaliation in Violation of Title VII of the Civil Rights Act of 1964 (Count I), Retaliation in Violation of the Elliot Larsen Civil Rights Act (Count II), and Retaliation for Filing Workman's Compensation Claim/Breach of Public Policy (Count III). On June 12, 2013, this Court entered an Order Dismissing Plaintiff's State-Law Claims in Counts II and III of Plaintiff's Complaint [Dkt. 7]. Defendant now moves for summary judgment under Fed. R. Civ. P. 56.

---

[4] Plaintiff was placed on medical restrictions by three separate treating physicians while on leave. *See* Dkt. # 18, Ex. 4, p. 66-67. Plaintiff testified at her September 17, 2013, deposition—more than a year after her July 26, 2012, termination—that the medical restrictions of those three physicians remained in effect. *Id.*

6

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

"[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

Plaintiff claims Defendant retaliated against her for engaging in various protected activities, thereby violating Title VII of the Civil Rights Act of 1964. *See* 42 U.S.C. § 2000e *et seq.* Under Title VII, it is an unlawful employment practice "for an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Plaintiff alleges that Defendant perpetuated a pattern of retaliation against her by:

> a) disputing Plaintiff's Workers' Compensation claim as not work-related;
>
> b) refusing to accommodate Plaintiff by removing her from the temporary desk assignment;
>
> c) sending Plaintiff to Dr. Eckstein—"a general family doctor with no expertise in orthopedic examination"—for an evaluation regarding her application for a duty disability pension;
>
> d) denying Plaintiff's application for a duty disability pension;
>
> e) "pretextually terminating Plaintiff"; and
>
> f) again disputing Plaintiff's Workers' Compensation claim in December 2012, shortly after Plaintiff filed her 2012 EEOC retaliation charge against Defendant.

**A.     Plaintiff Fails to Show a Prima Facie Case of Retaliation under Title VII**

In the absence of direct evidence, a plaintiff may demonstrate a prima facie case of Title VII retaliation by showing:

> (1) that plaintiff engaged in a protected activity; (2) that the defendant had knowledge of plaintiff's protected conduct; (3) that the defendant took an adverse employment action towards plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381 (6th Cir. 2002). "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

### 1. *Adverse Employment Actions*

Defendant argues that with the exception of Plaintiff's July 26, 2012, termination, the adverse employment actions alleged by Plaintiff are without factual or legal support. First, Defendant argues that the disputed nature of Plaintiff's Workers' Compensation claim cannot constitute an adverse employment action by Defendant because Defendant outsources the handling of such claims to an outside, third-party administrator. Defendant relies on *King v. City of Ann Arbor* for the proposition that actions by a third-party Workers' Compensation administrator does not constitute an adverse employment action. *See King v. City of Ann Arbor*, 2012 WL 1232659, at *5 (Mich. Ct. of App., April 12, 2012) (concluding that "plaintiff did not suffer an adverse employment action" in part because "[d]efendant took no action against plaintiff" and there was no evidence that the third-party's decision was motivated by plaintiff's protected activity.). Plaintiff does not respond to Defendant's argument in her brief. As such, it appears that Plaintiff has abandoned this argument.

Even if Plaintiff has not abandoned this argument, the Court agrees with Defendant. Although *King* is not binding on this Court, its reasoning is nonetheless persuasive. In this case, Mr. Jordan, Defendant's Director of Employee Services, testified in his deposition that the Administrator, a third-party Workers' Compensation administrator, exclusively handled Plaintiff's Workers' Compensation claims. *See* Dkt. # 18, Ex. 8, p. 6-7. Thus, there being no

evidence that the Administrator had knowledge of the EEOC claims or the subsequent federal litigation, the Court finds that (a) Plaintiff failed to show that the Administrator had knowledge of Plaintiff's protected conduct, and (b) the Administrator's denial of Plaintiff's Workers' Compensation claim did not constitute an adverse employment action by Defendant.

Second, Defendant argues that neither sending Plaintiff to Dr. Eckstein for an evaluation regarding her duty disability pension application nor the denial of that pension constitutes an adverse employment action of Defendant because those decisions were made by the Board—an entity independent and distinct from Defendant. Plaintiff's only response to this argument is that because Defendant's Assistant Director of Employee Services issued Plaintiff's pension denial letter on *Defendant's* letterhead, the Board is not independent of Defendant. The Court agrees with Defendant.

First, the letter was in direct response to Plaintiff's inquiries with Defendant as to the status of her pension. The letter clearly states that it was the Board—not Defendant—that denied Plaintiff's pension and that Plaintiff is free to pursue an appeal of the Board's decision. *See* Dkt. # 19, Ex. 16. Second, Plaintiff's claim that the Board and Defendant are not separate entities is: (1) factually and legally inaccurate, and (2) disingenuous in light of Plaintiff's pending state court litigation against the Board regarding her application for a duty disability pension. *See* Dkt. # 18, Ex. 18. Third, Plaintiff herself alleged that it was the Board—not Defendant—that sent her to Dr. Eckstein for an evaluation in connection with her duty disability pension application. *See* Dkt. # 18, Ex. 18, ¶ 21. *See also* Dkt. # 19, Ex. 16. Therefore, the Court finds that neither the Board's sending Plaintiff to Dr. Eckstein for an evaluation nor the Board's subsequent denial of Plaintiff's pension constitutes an adverse employment action by Defendant.

As a result, the Court finds that the only tenable adverse employment actions alleged by Plaintiff are that Defendant: (a) refused to accommodate Plaintiff when Defendant removed her from the temporary desk assignment, and (b) terminated Plaintiff.

### 2. Causal Nexus

The Sixth Circuit provided the following standard in regard to a plaintiff's use of the temporal proximity of events for the purpose of demonstrating the fourth element of a prima facie case of retaliation—that there was a causal connection between the protected activity and the adverse employment action:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). In other words, in those cases where the retaliation occurs "very close" in time after a person engages in protected conduct, the close temporal proximity may alone satisfy the causal connection requirement. *See McNett v. Hardin Cmty. Fed. Credit Union*, 118 Fed. Appx. 960, 965 (6th Cir. 2004) (finding an inference of causation when "only 13 days" separated protected activity from adverse action); *Shefferly v. Health Alliance Plan of Mich.*, 94 Fed. Appx. 275, 285 (6th Cir. 2004) (stating that "the passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions gives rise to an inference of discrimination" for the purpose of establishing a prima facie case of retaliation.). Absent a "very close" temporal proximity between the engagement of protected conduct and the adverse employment action, however, a plaintiff must proffer additional evidence of retaliatory conduct in order to proceed with their case. *See Arendale v. City of Memphis*, 519 F.3d 587, 606-07 (6th Cir. 2008) (affirming summary

judgment for defendant and rejecting plaintiff's argument that retaliatory events occurring two months after filing an EEOC charge were sufficient to establish causal connection absent additional competent evidence of retaliation.).

Defendant contends that, given the timeframe of the events in this case, Plaintiff cannot establish the requisite causal nexus. Plaintiff appears to rely on the pattern of alleged adverse employment actions for the purpose of establishing an inference of causal connection by temporal proximity. As determined above, however, the Administrator's denial of Plaintiff's Workers' Compensation benefits and the Board's denial of Plaintiff's application for a duty disability pension were not adverse employment actions for the purpose of establishing a prima facie case of retaliation by Defendant. Therefore, the only remaining tenable adverse employment actions alleged by Plaintiff are the June 17, 2011, revocation of the temporary desk position, and the July 26, 2012, termination. These actions, however, are not "very close" in temporal proximity to Plaintiff's engagement in protected activity. Plaintiff filed the original EEOC charges against Defendant on December 23, 2009, and filed the corresponding federal lawsuit on November 19, 2010. As such, these events were separated by years and months rather than weeks and days. Therefore, the circumstances of this case do not give rise to an inference of casual connection.[5] As a result, Plaintiff "must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *See Mickey*, 516 F.3d at 525. Plaintiff's response is devoid of any additional evidence of retaliatory conduct. Accordingly, the Court finds that Plaintiff failed to establish the requisite causal connection.

---

[5] Plaintiff also alleges that the filing of the second EEOC claim and this lawsuit are protected activities. As both events happened after Plaintiff's termination, such activities could not be causes for any of the adverse employment actions alleged by Plaintiff.

*3.     Conclusion*

As set forth above, the Court has concluded that (a) the only tenable adverse employment actions alleged by Plaintiff are that Defendant refused to accommodate Plaintiff by removing her from the temporary desk assignment and that Defendant terminated Plaintiff, and (b) Plaintiff failed to establish the requisite causal connection between the protected activity and those two adverse employment actions. Therefore, the Court concludes that Plaintiff failed to show a prima facie case of retaliation.

**B.     Plaintiff Fails to Counter Defendant's Legitimate Business Reasons for its Actions**

Even assuming Plaintiff demonstrated a prima facie case of retaliation, the burden of proceeding with the evidence would then shift to Defendant to "articulate some legitimate, non-discriminatory reasons" for its actions. *Wrenn v. Gould*, 808 F.2d 493, 501 (6th Cir. 1987) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Defendant advances various non-discriminatory reasons for both adverse employment actions.

Defendant's July 26, 2012, termination of Plaintiff occurred as a result of Defendant's established practice that it will leave an employee's position open for one year during a medical leave of absence. If an employee is unable to return to work after one year, his or her employment is terminated at that time. *See* Dkt. # 18, Ex. 8, p. 10. Indeed, this policy had already been applied to Plaintiff during her previous 2010 – 2011 medical leave of absence. When Plaintiff took a *second* medical leave of absence, she never returned to work. In fact, it appears that even now Plaintiff remains under medical restrictions precluding her from returning to work as a police officer. *See* Dkt. # 18, Ex. 4, p. 66-67.

As for the June 17, 2011, revocation of Plaintiff's temporary desk assignment, that assignment was clearly contingent on the outcome of the Administrator's determination of whether the alleged injury was work-related. Moreover, Mr. Jordan stated that the front desk

13

position "doesn't mean you sit there and fill out paperwork." Dkt. # 18, Ex. 8, p. 13. Rather, the police officers working the front desk at that time often dealt with situations involving irate citizens and disputes in the lobby. Therefore, they were required to have the same functional capacity as those police officers on road patrol. *See* Dkt. # 18, Ex. 8, p. 12-13. *See also* Dkt. # 18, Ex. 15. Plaintiff's claim that Defendant also failed to accommodate her July 2012 request to return to the desk position fails for the same legitimate business reason.[6]

Even if the burden shifted to Defendant, "the ultimate burden of persuasion never shifted from the Plaintiff." *Wrenn*, 808 F.2d at 501 (citing *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Because Defendant proffered legitimate, non-discriminatory reasons for its conduct, Plaintiff must demonstrate by a preponderance of the evidence that Defendant's stated reasons were pretextual. "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000). Furthermore, a plaintiff must proffer "sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the [defendant] . . . did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (internal quotations and citations omitted). To demonstrate an honest belief, an employer "must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998).

---

[6] Defendant further informed the Court that, "in order to minimize the loss of patrol officers that are actively patrolling on the streets, [the Chief of Police] eliminated a patrol officer occupying the desk position at the City of Saginaw Police Department Headquarters." *See* Dkt. # 18, Ex. 15. Pursuant to an amended collective bargaining agreement, the desk position is now occupied by a civilian employee rather than a police officer. *Id.*

Plaintiff attempts to challenge the fact that she has not been medically cleared to return to work. Plaintiff claims she told Mr. Jordan that she was medically cleared to return to work at the desk position in July 2012. This statement, which is found in Plaintiff's deposition, is in direct contradiction to another portion of Plaintiff's deposition wherein she concedes that the medical restrictions placed on her by three treating physicians remained in effect long after her termination. *See* Dkt. # 18, Ex. 4, p. 66-67. The record in this matter is devoid of any evidence supporting the proposition that Plaintiff was medically cleared to return to work as a police officer as of July 26, 2012.

For the reasons set forth above, the Court concludes that Plaintiff is unable to call into question either the factual basis for Defendant's legitimate business reasons for its actions or Defendant's honest belief that Plaintiff was medically ineligible to return to work as a police officer. As a result, Defendant is entitled to summary judgment, and Plaintiff's retaliation claim must be dismissed.

## V.  CONCLUSION

Accordingly, and for the reasons set forth above, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Dkt. 18] is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Extension of Time to File Response/Reply [Dkt. 20] is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' cause of action is DISMISSED WITH PREJUDICE. Judgment shall be entered accordingly.

IT IS SO ORDERED.

DATED: December 2, 2014

s/Lawrence P. Zatkoff
HON. LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE